I'm going to move the admission of two of my clerks. Will you gentlemen please stand? Judge Chen and panel, I'd like to move the admission of Matthew Forrest Tootin, who is a member of the Bar and is in good standing with the highest court of Maryland. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications, which I will discuss in a moment. And I'd like to move the admission of Devin Scott Sykes, who is a member of the Bar and is in good standing with the highest courts of New York, District of Columbia, and Texas, as well as with the Supreme Court of the United States, the Second Circuit, and the Eastern and Southern Districts of New York, and the Court of International Trade. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Both of these lawyers have things in common, in addition to clerking for me. Both of them I've known for a long time. Mr. Tootin, since I carried him around in one hand, and Mr. Sykes for at least 10 years when he clerked at the Court of International Trade when I was a judge there. Each of them has substantial experience. Each of them is hardworking, bright, and has wonderful personalities. So accordingly, I move their admission. I favor both motions. Okay, based on the strength of your motion, Judge Wallach, the court grants your motion. Clerk. State your name. Raise your right hand. Do solemnly swear that you will report yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America. Thank you. Gentlemen, welcome. Congratulations. Okay. We have three argued cases today. The first one is BE Aerospace v. C&D Zodiac. Are counsel ready to proceed? Good morning, Your Honors. Andre Iancu from Irela, Manila, on behalf of BE Aerospace. May it please the court. Despite what might seem at first blush as simple technology, BE's curved wall laboratory for aircraft revolutionized the airplane interiors industry. It allowed for the nesting of a laboratory with the seats in front of the laboratory in order to save space in the airplane and therefore allow for significantly more passengers or passenger room on the plane, becoming critically important technology that opened the door to a billion-dollar industry. Here is the crux of the many problems with the PTAB's obviousness decision. First, there is no laboratory art in the record. It's just not there. Only the Betz coat closet. Now, the PTAB found that it would be obvious to put the Betz wall, such as it may be, on a laboratory. Let me ask you a housekeeping question. Sure. On page 54 of the blue brief, you say Zodiac admits and the PTAB does not question Nexus. And you cited page 22 of the appendix, but when I went to page 22, I couldn't find that. So, there is a lack of Nexus discussion in the PTAB's final written decision. The PTAB does not address the Nexus. So, that's your argument. Got it. It's just not there. So, they didn't find Nexus. We should just say that maybe they, for purposes of ultimately finding the claims unpatentable, they just, for the sake of argument, assumed Nexus? Yeah, look, the fact of the matter is we believe that the PTAB's analysis, especially on objective indicia, is cursory, it hand waves, and it finds without significant basis that the secondary considerations are, so to speak, what they call moderate. They do not address Nexus, and therefore, I mean, they don't say, look, the reason we don't find secondary considerations to be persuasive is because there is no Nexus. The fact of the matter is there is significant Nexus. This is as much Nexus as we can find, really, in a case. So, specifically... You had mentioned in your brief that Zodiac admits that there's Nexus. Is that with respect to all of the secondary considerations evidence or just the commercial success evidence? So, I don't know that Zodiac admits that there is no Nexus. The main point is that the PTAB does not find a lack of Nexus. The fact of the matter is that there is no significant challenge to the Nexus prong. But you said Zodiac admits in your blue brief, and that's where you cited Appendix 22. So, the only explanation you've given me so far is an absence of something. There is an absence, and it's their burden on obviousness, obviously. There is an absence from their side and from the PTAB side on Nexus. And the statement that there is an admission, so to speak, an express admission of no Nexus, that probably is an overstatement. There is a lack of evidence from Zodiac or from the PTAB that there is Nexus, a lack of Nexus. There is no question that there is Nexus here. If we look at the secondary considerations, Your Honor, you know, so just as an example, they all talk about saving space on the aircraft. There is a discussion in many of them about the scalloped wall of the BE laboratory. These are the components of the patent. It's a direct correlation between commercial success, a direct correlation between the praise, the Crystal Cabin Award that the industry awarded to the patented technology. Just when I was looking at the Crystal Cabin Award document in the joint appendix, I didn't see that award specifically calling out the recessed wall. It seemed to be more talking about how BE has somehow successfully come up with a way through better design and plumbing to come up with a much more slimline, modular, dolphin unit for an airplane, which is terrific. But I didn't see any discussion about, wow, they came up with a way to put a scallop in the exterior wall. I might add, I got the impression that the Crystal Cabin Award was for managing the shoehorn in an extra six seats. Well, right, right. So both are correct points, except that that's exactly what this patent does. Obviously, when the editor who wrote the blurb on the Crystal Cabin Award did not have the patent in front of it, but adding the six extra seats or creating the slimline, it's exactly what this patent does. Your position is that even though the claims don't say that this allows for additional seats to be put on the plane, that that's something that should be either read into the claims or understood from claims by virtue of the features that are claimed? I mean, how do you link this idea that there's an ability to put more seats on the plane as a result of a recessed wall when it's not, in fact, claimed? Sure. So the wall is recessed and it is shaped such that it conforms to the shape. Legally, how are we supposed to find a nexus when you haven't claimed the idea that there's additional seats that can be put on the plane? Because the technology, that's what it's all about. The shaping of the wall contoured such that it substantially conforms to the seat in front of it. If we read the specification, it is all about saving extra seats. That's why they are supposed to be conforming to each other. And let me point the court to the rest of the secondary consideration evidence, which is, for example, in the Wall Street Journal and other articles praising this technology that actually does call out the scallop wall. I don't believe that legally, Your Honor, there has to be the precise language in the claim that exists, can be found in articles or awards down the line. What needs to be clear, though, and I think that is the case here, is that what the claims enable is the technology that has won the praise. And it is – that is the exact thing that we're talking about here. I understand why you want to keep talking about the technology. And when I think of technology, maybe you and I have competing conceptions of what that means when it comes to putting a dent in a wall. But I guess when we try to hone in on what was being praised, I saw statements in those praise documents that was praising the technology and slimming down the bathroom unit. You know, better planning, getting space from behind the sink. And then it also a couple times mentioned the idea of having a recess in the exterior wall. And then the praise would go further and say that would be so that those seats right in front of that wall could recline. It wasn't about adding – the recessed wall wasn't so connected, at least in those articles, to the notion of having a recessed wall. It seemed like it was just merely to allow those people to recline their seats. Really, it's all about moving the seats back so that you can get the extra seats on the plane. Am I correct that what it does is it allows you to move the seats back and recline because of the recess? Not necessarily. Not necessarily. So on some planes, for example, it doesn't recline at all. The point of the patent – the patent in the spec doesn't talk at all about the recline, really. It's all about moving the seats back to save space. I want to go to a different point, which is that there is nothing in the record to support the PTAP's finding that it would be obvious to apply the Betz wall to a laboratory, which is the crux of the argument from Zodiac and also the finding in the final written decision. The single point that the final written decision relies on is the testimony of a litigation consult, the expert witness from the other side, Mr. Anderson, period. There is absolutely nothing in the record to – The Betz reference itself says, I want to put this recess in this wall of the airplane cabin. Why? Because by doing that, I'm going to be able to provide more space in the cabin for passengers. And so therefore, I didn't see the board solely and singularly relying on, as you would call it, some paid expert. But it was actually relying on a statement from the prior art reference itself and then concluded, well, Betz has a recessed wall in the airplane, and Betz is using it for the same purpose as the claim convention. And so the idea is, any time you have a seat slammed up against the back of a wall in an airplane, why not do exactly what Betz did and have a recessed wall so that you can provide more space, whether it's a galley, whether it's a closet, or even a laboratory? So two points. First of all, that's not exactly what Betz – Let me just point out to you in all fairness, you're into your rebuttal time, and you won't get extra time out of me. So let me just answer Judge Chen's question, and then I'll stop. So first of all, Betz says, I'm putting the recess in the wall to allow for tilting. That's what it says at column two. Not to move seats back or to save space, just for tilting, and that's not what the 838BE patent is about. Second point is, it does say that we have the coat rack, the mechanism to lift the coats out of the way so that passengers have more room to walk behind the closet. It's a non sequitur that more space needs to be saved on an airplane. Everybody tried to do that, right? It's a decades-old problem. It's a fixed configuration. Space needs to be fixed. What is missing from Betz and all the prior art is doing that with a laboratory. There is zero indication anywhere in the prior art that anybody thought of playing around with the laboratory, curving the laboratory, slimming it down, touching it in any way, until BE. And when BE did it, it really revolutionized the industry. I'll reserve the rest. Thank you, Your Honor. Good morning. I'm John Halamani here on behalf of C&D Zodiac. May it please the Court. I'd like to address a few comments. There's no dispute in this record that lavatories, enclosure units, including single-space lavatories, are well known in the prior art. So when you open the 838 patent and look at the very first figure, it's a rectangle. And it has a chair sitting next to it. It says prior art. So all you know from that first figure is that the rectangle with the chair is prior art. And you open the specification of the 838 patent, and the 838 patent says that's a prior arrangement of a lavatory with a flat wall next to a seat. Let me ask you a housekeeping question. Because I'm bothered by this kind of thing, and I always like to ask another. On page 52 of the opening brief, you say that BE, quote, blatantly misrepresented Mr. Anderson's testimony when it stated that Mr. Anderson, quote, confirmed that BETS is not an enclosure unit, close quote. And you base your position on Mr. Anderson's statement that the upper and lower enclosures in BETS form an enclosure unit. And I went to the joint appendix 3375 and 76, where Mr. Anderson later testified that those enclosures do not form an enclosure unit. Based on those competing statements, how can you say that BE blatantly misrepresented the record? Because in Mr. Anderson's testimony, he testified that the top of the BETS closet was an enclosure, the bottom of the BETS closet was an enclosure, that the middle portion was not an enclosure, and then he circled the entire closet, the entire BETS closet, and said that is an enclosure. And so his testimony is consistent with the BETS reference, which labels the entire enclosure as a closet. And so to say that he said that BETS was, that he only said that BETS was multiple enclosures is inconsistent with his testimony. It misrepresents what he said. Let me turn to the nexus. BE's counsel suggested that there is a nexus and that we didn't contest nexus. And that's not true. We did, in fact, contest nexus. Show us in the record. I will. Absolutely, Your Honor. The Crystal Cabin Award, for instance. What page is your nexus argument? Pardon me? What page is your nexus argument? I'm pointing to, I'm pointing in the record in the appendix to 3040. I'll have to look it over. Did you say pages 30 through 40? 30, 3040 of the joint appendix. I was actually going to point to a part of the record that we relied on. That's not your petition or your petitioner reply, 83040. No, I was relying on the Crystal Cabin Award that was presented, on information about the Crystal Cabin Award that was presented by BE. How is that a reflection of your position on nexus? Yeah, I'm sorry. My question was specifically where to the board did you, C&D, argue that there was no nexus for the other side's proposed secondary consideration evidence? I'm not sure that I have a specific side to a point. The point that we made about all the nexus, all the secondary considerations was that they reflected parts other than, things other than the scallop and the forward wall. And I don't have a side at this moment, but I will look for one or ask Mr. Reed if he could find one. That would be a good thing to do. Yes, Your Honor. He's pointing me to appendix 4246. Okay. 4246. Hang on a sec. That would be in the second volume. Yeah. 4246. What is this? This doesn't look like a brief. This is the oral argument slide that we presented to the board during oral argument. Okay. We quote here from the Microsoft Proxycom case in Ray Wong. So we presented to the board the argument that the patent owner fails to evidence required nexus. And if we continue, we talk about the fact that many of the evidence of secondary considerations that the patent owner presented were tied to other features. We quoted the declaration of Dr. Frazier, who is a marketing expert who testified during the case in the form of a declaration. Okay. Well, at this point, the board, assuming this is sufficient, right, he's demonstrative that an oral argument is enough to preserve the argument, the board didn't make a finding on this nexus question. So we can't review or make a decision on the correctness or incorrectness of whether there's nexus. For purposes of this appeal, we just have to assume it's there. I think, Your Honor, it would be fair to assume that the board found some level of nexus between the evidence of industry praise, the Crystal Cabin Award, and the articles to which these counsel refers. I think it's fair to assume that there's some nexus there because the board gave some weight to those references. I think it's also the board's finding, factual finding on that, which is subject to deference, obviously, on the substantial evidence standard. I think it's entitled to deference because there are elements, for instance, the part of the appendix that I pointed to that show that all of that praise, industry praise, is related to things other than the scallop in the forward wall, the recess in the forward wall. So we did present the argument. I don't think you want to go that far and say all the praise in those praise documents relate to things that are not related to the recessed wall. Probably the safer thing to say is it's more of a mix. There's some commentary calling out the fact that the wall has been recessed, and then there's other things that are also identified for reasons for praising this new modular laboratory unit. Your Honor, I think each of the pieces of industry praise do call out features other than the recess in the forward wall, at least the ones that are cited. So the Crystal Cabin Award does. The Apex article talks about the loo having a scalloped wall and yet not losing space inside. So I think each of them do. They talk about improved plumbing, making use behind the sink. And I'm referring to the appendix at 3763, 64, and 66, which is where these articles are reproduced. But each of them has a feature, at least some feature, recited other than the scalloped wall itself. So at least for those references, I think it's fair to say there's something in there. Again, I believe it's fair, as you say. You're telling me there's no document that they submit that points to the wall as being something that's praiseworthy? No, Your Honor, I wouldn't go that far. Okay, that's all I wanted to know. That's correct. I want to move to motivation and buying briefly. The Betts reference, as you point out in the first paragraph, talks about the need to make more space in the cabin. So as you look at the Betts patent, the Betts patent has a closet. The very first paragraph says what you want to do is take the coat rack and move it up out of the way. I think the only fair way to look at the Betts closet is to look at it as a closet in the cabin of the aircraft, which the coats were moved out of the way so that the recess could be added to the forward wall. And 40 years before the 838 patent specifies the exact same reason for doing so, and that is to make more room for passengers. And so just like the enclosure unit in the 838 patent, the Betts patent specifically discloses that you create a recess in the forward wall to allow the seat to sit closer to that enclosure unit than it otherwise would if that forward wall were flat and still provided room for the coats to be stored. The Betts lacks the additional benefit of causing claustrophobic passengers to get out of the bathroom as quickly as they possibly can. That's very true, Your Honor. Absolutely. Can you tell me in Betts where you're pointing to specifically? You're saying column one? It's the very first paragraph in Betts that I'm pointing to, Your Honor. OK. So it's appendix one, four, I'm sorry, one, zero, four, four. The very first paragraph says there are a number of ways to elevate a coat rack so that it will be out of the way. You have a coat rack, it's a closet, it has a coat rack. You elevate the coat rack out of the way to provide more room for passengers. And then it shows in figure one what the result is, and that is a recess in the forward wall of that coat closet. I think in our brief at pages 15 through 17, you see the commercial embodiments of Betts that were created in 1978 at least that show the various ways that closet was built, and that is the commercial embodiment actually has a thicker center section. And so one of the skill in the art, at least by the time of 2010, when the A3A patent was filed would know that that is one enclosure, that the wall is recessed in the middle and it's larger in the bottom. The overall enclosure unit is a closet. It has a function, that is to store things. I think it's a typical closet one of the skill in the art would understand. I think a layman would understand that closets function to store multiple things. So it's clear that Betts falls within the scope of the enclosure unit. And then the premise of the A3A patent, again, is that one of the skill in the art would understand what a laboratory is, what a laboratory contains. And so there's no dispute that a laboratory is both claustrophobic and useful for certain things, and it does include a sink, that it can't include a toilet, that it can't include lights, et cetera. There's no dispute over that. The premise of our argument, the premise of the bare boards holding, is that one of the skill in the art would have known that. One way in which you know that that's true is that the A3A patent provides no description whatsoever of what's inside the laboratory. How does Betts physically allow a passenger seat to be located against the forward wall of an adjacent structure? The Betts recess allows the seat to be placed further back than it would if the wall were flat. So if the wall in the Betts closet were flat, straight down from the top portion of it, the seat would have to be moved further forward. In the case of the Betts patent, there's a design. That's because the seat itself is not totally vertical erect, the seat back in an upright position. It's default position is already leaned back a little bit. That's correct, Your Honor. It's definitely not flat in a vertical plane as the claim recites. So that's part of it. And then the other part is a design constraint for that particular aircraft, and more particularly back in that time where seats had to be able to recline. The recess is larger than it needs to be for the seat just to sit further back in its upright position as is shown in Figure 1. It also has to allow room for the seat to function, and that is to recline. I wanted to reserve no more than a minute or so for rebuttal. I'd like to touch on the claim construction just briefly, if I may. The briefing, these briefings suggest that the board didn't resolve our disputes about claim construction. And so we actually, there were only two disputes about claim construction. The first was the substantially flat in the vertical plane, and the board resolved that dispute finding that a seat that is leaned back, at least somewhat in the unreclined position, is not flat in the vertical plane. That was as far as they needed to go to determine that beds fell within the scope of the claim. And then they addressed the unit term. The claims all recite an element that includes an enclosure unit or a lavatory stall unit, and so the board thrust the two limitations that we attempted to put on that term, and that is enclosed on all sides and having one function. So the board said both of those limitations are too narrow because of the fact that in the specification, enclosure unit includes a galley, and that a galley is not enclosed on all four sides, that it has multiple functions. I mean, at a high level, be as accurate that there is a high-level function, it is a galley or it is a closet, and that's true, but it's not limited to that single function. There are functions within that. Unless there are further questions, I'll reserve the last minute I have for rebuttal. Thank you. I don't quite understand. Are you going to argue about your counter, your cross-appeal, or are you just resting on your brief? I'll rest on the brief unless the other side argues something about it. I don't think there's anything to touch on. Well, if he's not arguing on that, then I will not either rest on our briefs as well. All right, so very quick points in my remaining time. First of all, on the claim construction, categorically wrong at least with respect to the two terms counsel mentioned. First of all, the claims require a shape that's not flat in a vertical plane. It's the shape that's not flat, not the position, and it cannot mean the tilting. So the shape has to be contoured and not flat. The question of what is the vertical plane, it just gives us the axis where the curvature or the contour is. So if I look at a chair such as this, for example, the question is where is that contour, the not flat? It's this vertical plane, okay? That is what has to be contoured. But isn't the definition of a vertical plane is something that has, you know, it's perpendicular to the ground. Isn't that what a vertical plane is? That's the ordinary meaning of it, right? It's perpendicular for the chair, so to the seat, vis-a-vis the seat. And it's not the horizontal, which is this section. What about – I think it was line 22 in figure 2 of the patent, which shows a line, right, giving us all a reference point of what a vertical plane could mean, and it totally confirms what your natural common sense instinct is, which is a line that is 90 degrees perpendicular to the floor of the plane. In that figure, in that direction. But if, you know, if the seat is moved in any way or the plane takes off, the point is vis-a-vis the seat back. That's what matters. And if we look at the specification, it's pretty clear that what we're talking about is the shape that has to be not flat. The problem is – one of the problems I have and I'm struggling with is that your specification in the background talks about contour. Yes. And uses the language contoured. But then the rest of the specification uses what I think might be a broader term. Your specification certainly doesn't equate not flat in a vertical plane with contoured. And instead, it uses the words, which gives the – two different words, which gives the impression anyway, or at least is equally plausible, that it's using those words to mean different things. And then we've got broadest reasonable construction. If we look at the parallel language in the specification, it uses contoured and not flat. The phrase – the sentences are effectively the same, except that sometimes it uses contoured, sometimes it uses not flat. It uses contoured only twice, I think, at most. That's correct. And then in the claims, it uses not flat. I think it's pretty clear that that's what it means. What it cannot mean, when it says not flat, the shape – In a vertical plane.  It doesn't say the shape. It says a portion that is substantially not flat, a vertical plane. No, the claim actually says a shape. It's multiple times. It says a shape. Oh, adding a shape. I see, I see. Okay. Okay, so it's the shape. So it cannot be that – I'll let you finish your response to Judge Stoll before you wrap up. Yes. So a shape that is not flat cannot include a flat shape, period, and tilting out of the plane. What it modifies, the not flat, what it modifies is the shape, and it simply cannot be that – even under the broadest reasonable interpretation, it cannot be that the whole meaning is changed, such that now the shape can include flat. Yes, final point. Ultimately, Your Honors, the fact that there is nothing in the record that touches on a laboratory and doing something with a laboratory until BE did it. And when BE did it, it created an entire revolution in the space. That's got to mean something. A patent that is issued on such revolutionary technology has to be – has to mean something when the actual record is completely silent on the combination that is urged by the other side. Thank you. Thank you.